254

Filed April 14, 1913.

EX REL. FLORENCE ANTEL
VS.
SAMUEL A. NATTANS AND INEZ
NATTANS.

*Horace S. Whitman* for relator.
*A. C. Binswanger* for respondents.

BOND, J.—

It is quite clear, I think, that this child must be given up to the exclusive custody of one or the other of the claimants. The attempt at joint control and enjoyment by persons of such widely different social levels and scales of living, was, I think, foredoomed to failure; and it was inevitable that sooner or later one side must give up the child and endure the pain that must result. That the child should live on as a member of the Nattans family, and yet continue as the daughter of the servant of some other household, seems to me an impossible situation. It would soon, now, notice the differences in its foster parents' favor. Its mother's presents are already beneath its notice. The mother can enter the child's home and surroundings only as one of the servants.

If the only question were which custodians promised more for the child's welfare; if it were not the child's own mother, but a remoter relative that now claims it, the answer would hardly be difficult. But no parent can be required to yield up its child to foster parents who would raise it on a higher level of wealth and social position, by reason alone of that opportunity for the child. No one would maintain such a doctrine as that. If the parent is fit to maintain it on the parent's own level, and has not by some act vested greater rights to its custody in others, the parent has an unqualified right to have and raise its own child. While it is frequently stated as law that the child's welfare is the prime consideration for the court in disposing of its custody, the rule must obviously be that that is the prime consideration only when, for some such reason as has just been mentioned, the court finds the parent to have lost the prior right.

It is true the mother here cannot now take the child to herself completely. Her necessities would compel her to put it out at board where the mother could only visit it. But in a household nearer the mother's scale of living, the mother can at least gain and retain the child's affection and some degree of intimacy with it, and even for this qualified enjoyment of her child she has the same prior right.

There has been some testimony derogatory to the mother's character, all of remarks made by her. But I have concluded that on all the evidence she is by no means unfit to retain charge and control of her child. There is much testimony of her steady good character. In the discussion between her priest, Mr. McGrath, and Mr. Nattans, which have been retailed fully in court, no question of the mother's character seems to have arisen. And the investigations of the Children's Aid Society seem to have left no question of her good character. Indeed, as the custody of the child, if awarded to the mother, will be under the supervision of that society, the danger from any possible bad character on the mother's part is not great.

Then, has the mother by her acts given the respondents any greater right to the custody? If a mother should desert her child, or abandon it to others, thus giving rise to a strong and presumably permanent attachment with those others, the latter may well contend that, in all fairness, they should be protected against any belated change of mind on the parent's part. But this mother seems never to have yielded up her child to such an extent. The evidence makes it clear that she let the child go to the Nattans, in the first place, only temporarily, as to a better place than any in which the mother could board it. And the Nattans took the child only for such purposes. And later when the mother consented to an indefinite stay with the Nattans, she did so with the intention that her relation of mother should continue as it would if the child were boarded out.

As has been said, this was a vain hope. The mother has seen her child passing from her. It has now a stronger attachment for the Nattans than for its mother. And now the at-

tempt to maintain this impossible dual relation must be given up. It is a hard case. Suffering must result to one side in the controversy. If the child is given to the mother, it, too, will suffer. It must be taken out of a life of comparative wealth, and be deprived of some opportunities; and it must be taken from those who are constantly with it as parents and placed among people who are strange to it, and where it will be visited by its mother only about once a week. But I cannot see that these advantages can be secured to it if we are to stop anywhere short of the doctrine that the offer of an easier life deprives a poor mother of the right to retain her child. Fortunately, the child is at an age where its affections may be easily transferred and new attachments may quickly be formed. And under the supervision of the Children's Aid Society it would be assured of good raising.

I shall sign an order awarding the custody of the child to its mother, under the supervision of the Henry Watson Children's Aid Society.